## Case No. 9,312.

### MAURO et al. v. RITCHIE.

[3 Cranch, C. C. 147.] [1]

Circuit Court, District of Columbia. May Term, 1827.

PRACTICE — DISTRICT OF COLUMBIA — ORPHAN'S COURT—APPEAL—REVIEW—REHEARING—GUARDIAN—APPOINTMENT TO FULL AGE—REMOVAL.

1. An appeal from the orphans' court, in Washington county, D. C., will be dismissed, if the transcript of the record be not transmitted to this court within thirty days after the order appealed from.

2. The orphans' court has a right to review its sentence, although thirty days have elapsed, and the party has lost his right of appeal from the original sentence; and from the judgment of the orphans' court, upon that review, an appeal lies to this court.

[Cited in Archer v. Meadows, 33 Wis. 175; Estate of Leavens, 65 Wis. 447, 27 N. W. 324.]

3. The difference between a rehearing and a review is, that a rehearing may be had before enrolment of the decree, but after enrolment the party is put to his bill of review.

4. A petition for a review in the orphans' court is analogous to a bill of review in chancery.

[Cited in Estate of Leavens, 65 Wis. 447, 27 N. W. 324.]

5. A judgment of the orphans' court against the petitioner, upon demurrer to the petition for review, is, in effect, a judgment that the errors suggested in the petition for review, as apparent on the record, were not such as ought to have induced the orphans' court to reverse its decree; and from this judgment of the orphans' court the party may appeal to this court.

6. The authority of a guardian appointed by the orphans' court, under the power given by Act Md. 1798, ch. 101, c. 12, § 1, continues until the full age of the infant; and such guardian cannot be removed, unless for refusal to give security, when required by the orphans' court.

7. After a guardian has been appointed by the orphans' court, the infant has no right, at the age of fourteen, to choose another.

[Cited in Smoot v. Bell, Case No. 13,132.]

8. By the common law, it was only where there was a guardian in socage, or by nurture, (in which cases the guardianship continued only till fourteen,) that the infant had a right, at that age, to choose a guardian.

9. Different kinds of guardians: (1) in chivalry; (2) in socage; (3) by nature; (4) for nurture; (5) by statute; (6) by custom; (7) by the chancellor; (8) by the ecclesiastical courts; (9) ad litem; (10) by election.

10. Of the four kinds of guardians at common law, one only exists in Maryland, namely, guardian by nature.

11. Guardian by nature, at the common law, has no authority over the lands of the infant; but his authority over the person of the infant continues until he is of full age.

12. The English statutes of 4 & 5 Phil. & M. c. 8, and 12 Car. II. c. 24, so far as they au-

[1] [Reported by Hon. William Cranch, Chief Judge.]

[1] [Reported by Hon. William Cranch, Chief Judge.]

thorize a father, by his will to appoint a guardian to his infant children, are in force in Washington county, D. C.

[Cited in Re Stockman, 71 Mich. 181, 38 N. W. 876.]

13. Under the Maryland statutes, it seems that the guardian by nature has the custody of the estates, as well as of the person of the infant, until the age of twenty-one; but the father was the only guardian by nature recognized by those statutes.

14. If the infant have no father, nor testamentary guardian, the orphans' court has the right of appointing the guardian to any infant who has an interest in lands, by descent or devise; or is entitled to a legacy, or distributive share of the personal estate of an intestate.

15. By the term "natural guardian," in the act of 1798, must be intended such a natural guardian as is entitled to the guardianship of the estate, as well as of the person of the infant.

16. The act of 1798 does not in any manner recognize the right of the infant to choose a guardian at any age.

17. The orphans' court, whenever it has authority to appoint a guardian, may appoint him to the full age of the infant.

18. An infant cannot choose a guardian, nor can the court appoint a guardian, unless the infant be personally brought into court.

19. A guardian cannot be removed, without notice and citation to show cause.

Appeal from the orphans' court, who had removed the appellants, (who had been duly appointed guardians of John W. Ott, an infant,) and appointed the appellee, John T. Ritchie, guardian in their place.

Before CRANCH, Chief Judge, and MORSELL and THRUSTON, Circuit Judges.

CRANCH, Chief Judge. On the 13th of September, 1826, Joseph Forrest and Philip Mauro, by J. Marbury, "their attorney," applied to the orphans' court for leave to file their petition, praying that court to review its order, granting to John T. Ritchie the guardianship of John W. Ott, to whom the petitioners had been appointed guardians in the year 1821; and that the said John T. Ritchie may be cited to answer the prayer of the petitioners. Whereupon that court ordered that leave be given as prayed, and that a citation be issued against the said Ritchie, returnable to the 20th of September, 1826. The petition was accordingly filed, stating the appointment of the petitioners as joint guardians of John W. Ott; that they gave bond, &c.; that the said John W. Ott is still under age, being about fourteen years old, and still subject to their control and care; that on the 9th of August, 1825, John T. Ritchie, ("who, your orators pray, may be made defendant to this bill of review,") made application to be appointed guardian to the said orphan, and filed a letter from the said orphan, dated from Frederick city, in the state of Maryland, on the 14th of July, 1825, directed to the judge of the orphans' court of the county of Washington, in the District of Columbia, in which he represents himself to be fourteen years of age, and states that he chooses the said J. T. Ritchie as his guardian, and requests that he

may be appointed. Whereupon the judge of the orphans' court, without notice to the petitioners, without having caused the orphan to be brought into court, and without further evidence, or other proceeding, by a decretal order appointed the said J. T. Ritchie guardian of the infant, which decretal order is signed and enrolled; that they are aggrieved thereby, and that it is erroneous, and ought to be reversed and annulled. And they assign for error: (1) Because the petitioners were appointed guardians under Act 1798, c. 101, c. 12, § 1, which gives the court power to appoint a guardian for an infant until the age of twenty-one, and that having exercised that power, by appointing the petitioners guardians of the infant till his age of twenty-one, it was not competent for the judge to remove the petitioners and appoint a new guardian except for cause shown, in the omission or neglect of duty, &c.; and if such neglect were alleged, the petitioners were entitled to be cited and heard. (2) Because the infant had no right, at the age of fourteen, to choose a guardian, having had guardians appointed until he should be twenty-one years of age. (3) Because the infant was not brought into court, and under the inspection and examination of the judge; that his age, competency to choose, and wish might be distinctly known to the judge. (4) Because the petitioners were not cited to show cause why they should not be removed, and the said Ritchie appointed guardian. (5) Because the petitioners had no notice of the application and appointment of the said Ritchie until after the said order was made, and had no opportunity to object to the same. "For all which errors in the said decretal order your orators have brought this bill of review, and humbly conceive that they should be relieved therein. In tender consideration whereof, and for that there are divers errors and imperfections in the said decretal order and proceedings, by reason whereof the same ought to be reviewed and reversed, &c.; and to the end that the same may be reviewed and reversed, &c., and that the said J. T. Ritchie may answer, &c., and that your orators may be relieved according to equity and good conscience, may it please your honor to grant your orators a subpoena to the said J. T. Ritchie," &c., and they file a record of the proceedings referred to. The said J. T. Ritchie appeared on the 20th of September, 1826, and prayed further time to answer, which was given to the 27th, when he appeared by Mr. Swann his solicitor, and said, "that the bill of review, so as aforesaid exhibited against him, and the matter therein contained, are not sufficient in law to compel him to answer the said bill," &c. "wherefore for want of a sufficient bill in this case the said John prays that the said bill may be dismissed," &c. And the said Joseph and Philip, by J. Marbury their attorney, say that the bill, &c., is sufficient in law, &c. &c.

The cause having been submitted to the

judge of the orphans' court, without argument, he decreed that the prayer of the petition could not be granted, and that the petition be dismissed with costs. Upon which decree the petitioners appealed to this court.

The original order, appointing the petitioners guardians, was in these words: "March 21, 1821. Catharine Ott having declined the appointment of guardian to the infant children of her son, the late Doctor John Ott, it is by the court this day ordered, that Joseph Forrest and Philip Mauro, both of said county and district, be appointed joint guardians of the said orphan children of Doctor John Ott, deceased, they entering into a bond of $20,000, for each guardianship, with William Cooper and Hanson Gassaway securities." On the 9th of August, 1825, John T. Ritchie made application to the court to be appointed guardian to John W. Ott, and filed the following letter: "Frederick City, Frederick County, July 14th, 1825. To the Honorable Mr. Lee, Judge of the Orphans' Court for Washington County, in the District of Columbia. Honorable Sir,—I beg leave hereby to make known to you that 1 am the son of Doctor John Ott, late of Georgetown, in the District of Columbia, deceased, and am above the age of fourteen years, but under twenty-one; and I do choose for my guardian, my uncle, John T. Ritchie, of Georgetown aforesaid; and do hereby make application to you, sir, and request that you will be pleased to appoint him my guardian; that thereby he may possess and exercise the right of protection to myself and the property that has descended to me. With great respect, I remain your most obedient servant, John W. Ott." On the back of which letter was the following affidavit: "Maryland, Frederick County, ss. On the 14th day of July, 1825, personally appears John W. Ott, son of Doctor John Ott, late of Georgetown, in the District of Columbia, deceased, the individual whose signature is attached to the within letter, before the subscriber, a justice of the peace in and for said county; and the said John W. Ott, being by me privately examined apart from and out of the hearing of all persons whomsoever, declares that he had written the within letter for the purpose of having it delivered to the Honorable Judge Lee as thereby directed, with the view to procure the appointment of his uncle, John T. Ritchie, to be his guardian, and that he has not been induced to choose his said uncle to become his guardian by threat or ill usage of his said uncle, or of any other person, or through his or their displeasure. Witness my hand, George Rohr."

It is noted on the record of the orphans' court, that the court delivered an elaborate written opinion, concluding with a decree that the petition of Forrest and Mauro be dismissed with costs. It appears from that opinion, the substance of which was published in the National Intelligencer of the 25th of December, 1826, that although the counsel of Mr. Ritchie objected to the court's opening the case upon this bill of review, yet the court did open it; and did reconsider and confirm its former decree; and the question whether that court had power thus to review its decree is to be considered as reserved for the appellate court. The appeal from the original decree appointing Mr. Ritchie guardian, was dismissed by this court at May term, 1826, because the transcript of the record was not transmitted within thirty days after the decree. It is now contended by the counsel of Mr. Ritchie that the present appeal is to the refusal of the orphans' court to review its former decree, and not to the decree which in effect affirmed its former decree; so that the only question now before this court, as they contend, is, whether the orphans' court erred in refusing to reconsider its former decree. But the elaborate opinion of that court shows that it did review its former decree, and that it was because it found that decree to be correct that it passed the decree for dismissing the petition of Forrest and Mauro. The former decree was reviewed, and in fact affirmed. Does the appeal from this last decree bring before this court the question whether the former decree was correct? If it does, and if this court should be of opinion that the first decree was erroneous, and that the orphans' court, upon the review or rehearing, ought to have reversed that decree, is it competent for this court to reverse it? If the orphans' court, in its discretion, had a right to review or rehear the cause, and did review or rehear it, we suppose no one will doubt the right of either party to appeal from the new decree made at the rehearing.

The first question, then, is, whether the orphans' court had a right, circumstanced as the cause then was, to grant a rehearing, or to review its decree. It is said that the proceedings of the orphans' court are analogous to those of a court of chancery, and that by the rules of that court a cause cannot be reheard after the decree has been enrolled; and that it is considered as enrolled after the expiration of the term in which the decree was rendered. To this it is answered, that the orphans' court has no terms. It sits every day, or whenever the judge thinks proper. That its decrees are never, in fact, enrolled, and are only to be found in the paper minutes of the court. That the court is not bound by the rules of the chancery court; and if it were, yet in courts of chancery a rehearing is often had after the term in which the decree is pronounced, and is always within the discretion of the court, who will, and often have set aside the enrolment for the purpose of letting in a party to a rehearing. 1 Har. Ch. Prac. 649, and to this effect were cited the case of Travis v. Waters, 1 Johns. Ch. 48; and Consequa v. Fanning, 3 Johns. Ch. 364. See also the case of Mills v. Banks, 3 P. Wms. 1, 8, where a cause was reheard after a lapse of eighteen years, and where

the chancellor says that a rehearing is in the discretion of the court, and is not always a matter of right; and in one case, where the decree was not enrolled, the court refused to discharge an order for a rehearing, although at the distance of about twenty-four years. The principal difference between a rehearing and a review, is in this, that a rehearing may be had before enrolment of the decree; but after enrolment the party is put to his bill of review, which, if it be founded upon new matter of fact, discovered since the closing of the commission to examine witnesses, cannot be filed without leave granted upon petition; but if it be founded upon error in matter of law apparent upon the record, no such previous permission of the court is necessary. In the latter case, "the constant method is to put in a plea, and demur, namely, a plea of the decree, and a demurrer against opening the enrolment; and an answer is rarely required, unless the same be ordered by the court; so that in effect a bill of review cannot be brought without leave of the court, in some shape; for if it be founded upon matter apparent in the body of the decree, then, upon the plea and demurrer, the court judge whether there are any grounds for opening the enrolment; and if upon matter of fact newly discovered, the court, upon the petition for leave to file the bill, will judge whether there be any foundation for such leave." 1 Har. Ch. Prac. 170.

The court, then, had a right to review its decree. In the present case, leave was granted "to file a petition, praying the court to review its order, in granting to John T. Ritchie the guardianship of John W. Ott." This petition was analogous to a bill of review in chancery, and points out the errors in law apparent upon the record for which it alleges that the decree ought to be reversed. It admits that the decree had been signed and enrolled, and prays that it may be reviewed and reversed. To this bill, or petition, the defendant, Mr. Ritchie, was cited to answer; and, having appeared, filed a general demurrer; to which there was a general replication and joinder. The decree of the orphans' court thereupon was, that the prayer of the petition cannot be granted, and that the petition be dismissed, with costs. This decree must be referred to the demurrer, and considered as a judgment in favor of the defendant, upon the issue of law joined by the parties; and cannot be considered as the mere exercise of the discretion of the court in refusing to review its decree, or to rehear the cause. That discretion was exercised, and perhaps expended in the order for leave to file the bill of review. The decree is, in effect, a judgment that the errors, suggested in the bill of review as apparent on the record, were not such as ought to have induced the orphans' court to reverse its decree appointing Mr. Ritchie guardian to John W. Ott. The parties had, by the demurrer and joinder, submitted to the court a matter of law, (of right,) not of discretion. The court decided the matter of right, and the parties, aggrieved by the decree, have appealed to this court. The question, then, upon this appeal, is, whether that matter of law, (or right,) thus put in issue by the parties, has been correctly decided by the orphans' court.

The bill of review states five grounds of error: (1) That the petitioners, Forrest and Mauro, had, by a previous order of the court, been appointed guardians of John W. Ott, by virtue of the first section of the 12th chapter, Act 1798, c. 101, and that it was not competent for the court to remove them, except for cause shown, in the omission or neglect of some duty; nor without being cited and heard. (2) That the orphan, having had a guardian appointed for him until the age of 21, had no right, at the age of 14, to choose a guardian. (3) That he was not brought into court to choose his guardian. (4) That the petitioners were not cited to show cause why they should not be removed; and (5) That they had no notice of the application and appointment of Mr. Ritchie, until after he was appointed.

1. By the 1st section of the 12th chapter of Act 1798, c. 101, it is enacted, "that whenever land shall descend, or be devised to a male under the age of 21 years, or to a female under 16," "and the said male or female shall not have a natural guardian, or guardian appointed by last will, agreeably to the statute in that case made and provided," (12 Car. II. c. 24,) "the orphans' court shall have power to appoint a guardian to such infant until the age of twenty-one years, if a male, and until the age of sixteen, if a female, or marriage." Under this clause of the statute, the petitioners Forrest and Mauro were, in 1821, appointed joint guardians of the infant children of Dr. Ott. As the court had power to appoint them guardians until the full age of the infants, and as they were appointed generally, without limitation of time, their authority continues until the infants respectively attain that age, unless it be lawfully revoked by the court. The orphans' court has no express power, under the statute, to remove a guardian, or to revoke the appointment, except in the single case of his refusing to give security when required; and by the 20th section of the 15th chapter of Act 1798, c. 101, it is enacted, "That the orphans' court shall not, under any pretext of incidental power or constructive authority, exercise any jurisdiction whatever, not expressly given by that act, or some other law." If it claim jurisdiction to remove a guardian for any other cause, it must claim it as a jurisdiction incidental to the power of appointment. But all incidental jurisdiction is expressly forbidden by the statute. The orphans' court, therefore, had no power to remove the guardians, or to revoke their authority, they never having refused to give the security required.

2. But it has been contended that an infant has a common-law privilege of choosing a guardian at the age of fourteen, and that this privilege has been "sanctioned by the uniform usage, in England and this country, of a thousand years;" that it is "a solemn, immemorial right;" and that the statute, when it authorized the court to appoint a guardian until the infant should attain the age of twenty-one years, meant to say, "unless the orphan, after he shall arrive to the age of fourteen years, shall object to such appointment, and ask permission to choose another guardian." [2] But it was not contended that this was an absolute right to choose a guardian; but a right to be exercised under the "surveillance" of the court; for it was admitted that the court would not appoint the person nominated by the orphan if he "were non compos, convicted of an infamous crime, or notoriously dissolute and immoral; nor unless he gave ample security for the faithful discharge of his trust." The statute does not in the slightest manner recognize, or allude to, the right of the infant to choose his guardian; but by giving the court an absolute power to appoint a guardian till twenty-one, evidently negatives the idea of any such right; for such a right is inconsistent with the power given to the court. But it seems to have been taken for granted that, by the common law, the infant had a right to choose his guardian in all cases. This is not true. When there was a guardian in chivalry, or by nature, or by statute, the infant had no right to choose. It was only when there was a guardian in socage, or for nurture, in which cases the guardianship continued only till the age of 14, that the infant's right of election existed.

By the law of England there are various kinds of guardians: (1) Guardian in chivalry; (2) in socage; (3) by nature; (4) for nurture: (these four were by the common law); (5) by the statute of 4 & 5 Phil. & M. c. 8, and 12 Car. II. c. 24, § 8, by which statutes the father has a right, by deed or last will, to dispose of the custody of his infant children until their age of 21, or for a less time, and these are called "testamentary," and sometimes "statutory" guardians; (6) guardians by the custom of particular manors, cities, &c.; (7) guardians appointed by the lord chancellor, exercising, in this respect, the royal prerogative of parens patriae; (8) guardians appointed by the ecclesiastical courts; (9) guardians ad litem, appointed by any court in which the interests of an infant are litigated (3 Bl. Comm. 426; Harg. Co. Litt. 88b, note 16); these are, in general, only appointed pro hac vice, and continue only until such interest is finally disposed of by the court; (10) guardians by election.

1. Guardian in chivalry existed only when the infant inherited lands holden by knight's service. This guardian had the custody of the person and lands of the infant until his full age of twenty-one, and took the profits to his own use without account; and also the value of the marriage of his ward. The infant had no right to elect a guardian. This tenure was abolished by the statute 12 Car. II. c. 24, and with the tenure went the right of guardianship connected with that tenure.

2. Guardianship in socage arose, like that in chivalry, wholly out of tenure. It was necessary that the ward should have inherited lands holden in socage. It continued only until the heir attained the age of fourteen, although some have said that it continued until the age of twenty-one, unless the ward, after his age of fourteen, should have elected another guardian. King v. Pierson, And. 313; Lit. § 123; Byrne v. Van Hoesen, 5 Johns. 67. The guardian in socage had the custody of the person and of the lands; but wholly for the benefit of the ward. The guardian in socage must be the next of kin, to whom the lands of the infant cannot by any possibility descend.

3. Guardianship by nature, existed only where the ward was heir apparent of the guardian, and extended only to the person of the ward. The father was always guardian by nature of the person of his heir apparent, even when the infant inherited lands holden by knight's service, and where the lord was guardian of the estate. Guardianship by nature continued until the full age of twenty-one; and the infant had no right to elect a guardian. This guardianship did not extend to the younger children who were not heirs apparent. Guardian by nature has no right to the custody of the infant's estate. H. St. G. Tucker's notes on 1 Bl. Comm. 461.

4. Guardianship for nurture extended only to the custody of the persons of those infants who are not heirs apparent, and continued only until their age of fourteen years, and none could have it but the father or mother. It only occurs where the infant is without any other guardian. After fourteen the infant is at liberty to choose his guardian. How this election is to be made, at common law, does not appear in any book that we have consulted.

The court of chancery, exercising, in regard to infants, the prerogative of the king as parens patriae, will appoint guardians whenever such appointment is necessary for the purpose of protecting the infant's general interest, or for the purpose of sustaining a suit, or of consenting to the marriage of the infant. In re Woolscombe, 1 Madd. 213. But it could never have been required, by the common law, that all the infants in the kingdom who had not guardians provided by the common law, should be brought into the court of chancery, to obtain them. The ecclesiastical courts have claimed a

---

[2] See the judge's opinion in the National Intelligencer of the 25th December, 1826.

right to appoint curators or guardians, as to legacies, and distributive shares of the personal estates of intestates, and this right has been admitted by the common-law courts; but their right to meddle with the persons of infants has been denied both by chancellors and by common-law judges. 4 Burn, Ecc. Law, 88, 91; Banes v. Lowder, 3 Keb. 834; Bishop of Carlisle v. Wells, 3 Jones, 90, 2 Lev. 162; Buck v. Draper, 3 Atk. 631; Rex v. Delaval, 3 Burrows, 1436. There is a dictum of Lord Chancellor Hardwicke in 2 Ves. Sr. 375, that "supposing there was no testamentary guardian, nor a mother, if the infant has any socage land, and is of the age of twelve, if female, or of fourteen, if male, they are allowed to choose their guardian; as is frequently done on the circuit, and is the constant practice, and what this court frequently calls on infants to do; though this is still liable to any reasonable objection made to such choice." Mr. Hargrave, in note 16 to Co. Litt. 88b, understands the expression "on circuit" to mean before a judge on the circuit. We have not found this practice alluded to in any other book, unless it be in Style, 456; but it is so explicitly stated by Lord Hardwicke that we must take it to be so; and it is probable that the appearance of the infant, and his choice, with the approbation of the court, were entered upon the minutes of the court, and constituted the only evidence of the title of the guardian thus chosen. This practice is, by Lord Hardwicke, confined to the case where the infant has socage land; and probably to the case where there had been a guardian in socage, which could only be where the infant took by descent. A person cannot strictly be said to have land unless he has a freehold estate; for none but a freeholder can be tenant to the precipe, or be the owner of real estate. Where an infant had land by purchase, and not by descent; or where he had only personal property, it does not appear that a guardian could be elected or appointed before a judge on the circuit.

The right of the ecclesiastical courts to appoint a curator of guardian for the personal estate, is probably no more than the right of every court to appoint a guardian ad litem (3 Salk. 177, pl. 14; 3 Burrows, 1436); for those courts, having jurisdiction as to wills and legacies, and the ordering of distribution of intestate estates, all legatees, and persons entitled to distributive portions of intestate estates, were parties before them; and if any of those parties were infants, those courts, as every other court, would have had a right to appoint guardians ad litem to protect their interests, so long as they were pending before those courts, and to receive and apply the money or other property which they should receive under the orders of such courts, who would have a right also to take security from such guardians for the faithful execution of their trust. This is prob-

ably the only foundation of the power of the ecclesiastical courts to appoint guardians; and it will not support a claim to appoint a guardian for the person of the infant, (Loury v. Reynes, 2 Lev. 217,) or for his personal estate acquired in any other way than by bequest, or in the course of distribution. In the case of guardian for nurture it does not appear in what manner, or before whom the infant, when he attained the age of fourteen, was to make his election; it is probable, however, that it was to be made as in the case of tenure by socage. Nor does it appear that an infant, by the law of England, had a right to choose a guardian in any case where a guardian had been appointed for him by any person having a discretion to choose, unless such appointment were expressly limited to the time of the infant's attaining the age of fourteen, which it is believed, in analogy to the rule of the common law in guardianship in socage and for nurture, was generally the case in appointments by the court of chancery, and by the ecclesiastical courts; after which age of fourteen they were generally permitted to nominate their guardians, and if the courts perceived no material objection, they appointed the guardians thus nominated. And. 313, 2 Lev. 217. After the statute of 12 Car. II. c. 24, which abolished tenures by knight's-service, almost all the tenures became tenures in socage, and, consequently, almost all guardianships as to lands, fell upon persons not personally chosen by anybody. It was right that these accidental guardianships should be removable at the age of discretion of the infant; but the same reason did not apply to guardians selected by any authority competent to choose persons well qualified to take care of the interest of the infant. Hence the statute of 12 Car. II. c. 24, § 8, authorized the father to appoint a guardian to his child until the age of twenty-one, without recognizing any right in the child to choose a guardian. This provision, Mr. Justice Blackstone seems to think, was made in consideration of the imbecility of judgment in children of the age of fourteen.

Of the four kinds of guardianship at common law, it is believed that only one exists in this country, namely, guardianship by nature. Tenancy by knight's-service, and, consequently, guardianship in chivalry, never existed here, as the lands were, by charter, to be holden in free and common socage. Guardianship in socage cannot, since the Maryland statute of descents, 1786, c. 45, exist here, because there cannot be found any of kin to the infant, who may not, by possibility, inherit the land. Guardianship for nurture cannot exist here, because it is applicable only to such children as are not heirs apparent; and here all are, by that statute, heirs apparent, and, consequently, guardianship by nature exists in this country, and applies to all the children. But a

guardian by nature, at the common law, has no authority over the lands of the infant, and, perhaps, not over his personal estate; as it has been decided, both in England and in some of these states, that he has no right to receive a legacy bequeathed to his ward. See Harg. Co. Litt. 88b, and note 12; Genet v. Tallmadge, 1 Johns. Ch. 3; Anderson v. Darby, 1 Nott & McC. 369; May v. Calder, 2 Mass. 59; Strickland v. Hudson, 3 Rep. Ch. 16S; Dagley v. Tolferry, 1 P. Wms. 285; Eq. Cas. Abr. 300, pl. 2; Gilb. Cas. 103; Philips v. Paget, 2 Atk. 80; Cooper v. Thornton, 3 Brown, Ch. 96, 186; Cunningham v. Harris, cited by the master of the rolls, in Cooper v. Thornton; Tucker's notes to 1 Bl. Comm. 462; 1 Vern. 295; 1 Johns. Cas. 217.

5. Statutory guardianship. The statute of 4 & 5 Phil. & M. c. 8, which, by implication, gave the father a right to appoint a guardian, by deed or will, to his daughters until the age of sixteen, and upon the death of the father, without such appointment, gave the custody of the daughters to the mother; and the statute of 12 Car. II. c. 24, § 8, which authorized the father to appoint, by deed or will, a guardian for his infant children until their full age, were in force in Maryland; and the latter is expressly recognized and referred to in the testamentary system of Maryland of 1798 (chapters 101, 12, § 1). These statutes are now in force in this country, and such guardians may now be appointed by the father.

6. Guardians by custom are unknown in this country.

7. Guardians by appointment of the chancellor. The chancellor in Maryland, it is believed, never had the power of appointing guardians, except ad litem.

8. Guardians by appointment of the ecclesiastical courts. No such courts exist in this country. The judge, or commissary-general, or deputy-commissaries, who exercised in Maryland the only remnant of ecclesiastical jurisdiction transferred to this country, had no such power. It was, by Act Md. 1715. c. 39, vested solely in the commissioners of the county courts, that is, the justices of the county courts.

9. Guardianship ad litem. All the courts had power to appoint guardians ad litem, to protect the interests of infants in their respective courts.

10. Guardianship by election, as mentioned by some of the English writers. has never been recognized in this country. Hargrave, in his note 16 to Co. Litt. 88b. says: "The right of making such an election arises only when, from a defect of the law, the infant finds himself wholly unprovided with a guardian."

Lord Coke, in Co. Litt. 87b. says: "If a man be seized of a rent-charge, rent-seck, common of pasture, and such like inheritances which do not lie in tenure, and dieth,— his heir within the age of fourteen years,— in this case the heir may choose his guardian; but if he be of such tender years as he can make no choice, then (if the father hath made no disposition of the custody of the child,) it were most fit that the next of kin, to whom the inheritance cannot descend, should have the custody of him. And whosover taketh the rent, &c., the heir shall charge him in an account. But if he hold any land in socage, in that case the guardian in socage shall take into his custody as well the rent-charge, &c., as the land holden in socage, because he hath the custody of the heir." This is a case in which Lord Coke supposes that the heir may choose his guardian before the age of fourteen. Mr. Hargrave remarks upon it, that "Lord Coke only takes notice of such an election where the infant is under fourteen; and, as to this, omits to state how, and before whom, it should be made. Nor have we yet met with any prior or cotemporary writer who supplies the defect. As to a guardian after fourteen, it appears, from the ending of guardianship in socage at that age, as if the common law deemed a guardian afterwards unnecessary. However, since 12 Car. II., enabling a father to appoint a guardian to his children till twenty-one, it has been usual, for want of such a guardian, to allow the infant to elect one for himself." "Such election is said to be frequently made before a judge on the circuit. 2 Ves. Sr. 375. But we do not think this form to be essential. The last Lord Baltimore, when he was turned of eighteen, having no testamentary guardian, and being under the necessity of having one for some special purposes, relative to his proprietary government of Maryland, named a guardian by deed." "Indeed, it seems as if there was no prescribed form of an infant's electing a guardian after fourteen, any more than there is before; and therefore election by parol might, perhaps, be sufficient, though it would be wrong to trust to a mode so unsolemn. But we do not wonder at the deficiency, because guardianship by election of the infant is of very late origin; it being, we believe, not only unnoticed by any writer before Lord Coke, except Swinburne, but there still being no cases in print to explain the powers incident to it, or whether an infant may change a guardian so constituted by himself. Even Lord Coke, we see, though professing to enumerate the different sorts of guardianship, and though he had before mentioned the latter one, omits it here." Co. Litt. 88b. "Whence it may probably be conjectured that, in his time, it was, in strictness, scarcely recognized as legal."

What Swinburne says in part 3, § 11, respecting the right of the infant to choose his tutor, applies only to the custom of the province of York. Buck v. Draper, 3 Atk. 631. Thus we see that the right of infants, at the age of fourteen, to choose their guardians, is not universal, nor has been "of a thousand years' standing." By the law of Maryland

(Act 1715, c. 39, § 7), "If any part thereof (that is, of the intestate's estate) belong to an orphan who is capable of choosing his guardian, such orphan shall be called to court (the county court) and shall then and there choose his guardian, into whose hands the said orphan's estate shall be committed; but if such orphan be not at age, then the justices aforesaid (of the county court) shall put the persons, lands, goods, and chattels of the orphans into the hands of such person or persons as they shall think fit, and take a bond, with two sufficient sureties, in the names of the orphans themselves, for the securing and delivering the said estate to said orphans, or their guardians, when thereunto lawfully called." The persons thus appointed, before the orphan is of age to choose his guardian, are, by the act, called trustees. It is not expressly said in the act how long these trustees shall exercise the rights of guardianship; but, from their being bound to deliver up the property to the orphans themselves, it is evident that the guardianship was to continue, or might continue, until the orphans should be of full age, and capable of receiving the possession of their estates; and by the provision being in the alternative, namely, to deliver up the estates to the orphans, or to their guardians, it is equally evident that guardians might be afterwards appointed; but as the county court had power, upon the trustees' refusal to give new security when required, "to remove the orphan's estates out of their hands" (Act 1715, c. 39, § 20), "and to remove the person and estate of such orphan into other hands" (Act 1729, c. 24, § 6), it does not necessarily follow that the trustees so appointed were to be removed of course, upon the infant's attaining the age of fourteen; nor that the infant, after such appointment, had a right, at the age of fourteen, to choose his guardian; for the obligation of the trustees to deliver up the estate to the guardian, when required, might be only an obligation to deliver it to the person into whose hands the court should order it to be removed, in the cases referred to in the 20th section of Act 1715, c. 39, and 6th section of Act 1729, c. 24.

This idea is corroborated by the 33d section of Act 1715, c. 39, by which, if a guardian should commit waste, and should fail to give security as the court should require, to answer to the orphan for the waste, when at age, the orphan (if at age to choose his guardian,) should elect his guardian; but if not of age to make such election, the court should appoint such other person as they should think meet; and the guardian so elected, and the other person so appointed, were to hold and enjoy the land and plantations until the orphan should "come to age." By this section, the persons appointed by the court while the orphan was under fourteen years of age, were required to hold the estate granted, until the full age of the infant; therefore, tak-

ing together the 7th, 20th, and 33d sections of Act 1715, with the 6th section of Act 1729, and Act 1763, c. 24, it seems to us that the right of the infant to elect a guardian, which is clearly recognized by those acts, is confined to the case where the infant is without a guardian or trustee already appointed by the court, or by the father, under the statutes of 4 & 5 Phil. & M. c. 8, or 12 Car. II. c. 24. By Act 1763, c. 24, the court was authorized, on application, to permit an orphan of fourteen years of age to choose his guardian; and if under fourteen, the court was to appoint the guardian, even before the distributive share of the orphan was certified by the commissary to the county court; and the guardian so appointed was to have the same power as a guardian otherwise appointed, viz. to hold the estate until the full age of the orphan. The act of Maryland of 1777 (chapter 8), by which the orphans' court was erected, gives to that court all the powers before vested in the county courts, or in the commissary general, in relation to guardians and testamentary affairs. Thus the law stood until the legislature revised the several acts upon the subject, and adopted the system reported by the chancellor of Maryland in Act 1798, c. 101.

In the previous acts nothing was said of guardians by nature, or natural guardians, or testamentary guardians, except that the latter are excluded from the operation of the 30th section of the act of 1715, which requires the guardian to ascertain the annual value of the real estate, &c., the words are "other (orphans) than such whom the testator in his lifetime, by his last will or testament, hath otherwise ordered and disposed of." But those acts only provided for the case of orphan infants; that is, fatherless infants. The legislature seems to have supposed that the father, as guardian by nature, had the custody and care of the real and personal estate, as well as of the person of his child; and does not seem to have considered the mother of an orphan as his guardian by nature, after the death of the father. This was not so at the common-law. By that law the guardian by nature, had only the custody of the person of his heir apparent; and, after the death of the father, the mother, if living, was guardian by nature to her heir apparent. The grandfather was also guardian by nature to his grandson, if he was his heir apparent. So the grandmother, the uncle, the aunt, &c., would, each, be guardian by nature to his or her heir apparent; and yet the old acts of Maryland, in all such cases, authorized the county courts to appoint guardians, although there were already, by the common law, guardians by nature whose authority over the person of the infant, continued until he arrived at the age of twenty-one years.

Those acts, and especially the act of 1715, having provided for a guardian in every case, except the case of an infant whose father was living, ought to be construed as having

virtually declared that the father, as guardian by nature, should have the custody and care of the real and personal estate of the infant, as well as of his person. But the acts did not give the courts authority to require surety from the father, as natural guardian, unless that authority were given by the 20th section of the act of 1715, which enacts, "that the justices of the county courts take able and sufficient security for orphans' estates, and inquire yearly of the security; and if there be just cause, that they require new and better security; and upon refusal to give new and better security, that they remove the orphans' estates out of their hands." This section was not deemed sufficiently explicit to enable the county court to demand security from guardians, chosen by infants of fourteen years; and to remedy this defect, an act was passed in 1752 (chapter 3), expressly for the purpose of enabling the court to require security from such guardians; but that act did not apply to guardians by nature. If the 20th section of the act of 1715, did not, by its general terms, include guardians chosen by infants, it could not include natural guardians nor testamentary guardians. Indeed, if testamentary guardians had not been expressly recognized in the 30th section of the act of 1715, it would be difficult to maintain that the general words, in which the 7th section gives the power of appointment to the county court, would not be justly construed as repealing the statutes of 4 & 5 Phil. & M. c. 8, and 12 Car. II. c. 24, so far as they might have been supposed to operate in Maryland. But it is believed that those statutes have always been considered as in force in Maryland, so far as to authorize a father to appoint, by his will, a guardian for his infant children.

Again, the 7th section of Act 1715, c. 39, by giving power to the court to appoint a guardian for every orphan who is entitled to a distributive share, superseded, in all such cases, the common-law right of guardianship by nature, except in the case of the father; so that neither the mother, nor the grandfather, nor the uncle, could, in such cases, be guardians by nature, in Maryland. From whence it follows, that after the statute of descents (Act 1786, c. 45), and before 1798, in Maryland, there were only three kinds of guardians, viz.: (1) Testamentary guardians under the statute of 4 & 5 Phil. & M. c. 8, and 12 Car. II. c. 24; (2) natural guardians; (3) statutory guardian, viz. guardian appointed by the county court under the statute of 1715, and by the orphans' court under the statute of 1777 (chapter 8). For although the orphan, at the age of fourteen, had a right to choose a guardian, the appointment was still to be made by the court; and although the persons appointed by the court, when the orphan was under the age of fourteen, were called trustees, yet they were, in fact, guardians, and had all the rights, and were subject to all the duties of guardians; they are, indeed, sometimes called guardians in the same act

of 1715. The infant, if no guardian had been appointed for him, and if his father were not alive, when he arrived at the age of fourteen, had a right to choose his guardian in court; but if a testamentary guardian had been appointed, or if the court had appointed a guardian for him before his age of fourteen, or if his father were living, he had no right to choose his guardian. If this be the true construction of the law of Maryland previous to 1798, the provisions of the act of that year (chapter 101) will be perfectly intelligible.

The act of 1798 (chapters 101, 12) does not, like the act of 1715, confine the power of the court to the case of orphans entitled to a distributive share of an intestate personal estate, but extends it to all infants to whom lands shall descend, or be devised, or who may be entitled to a legacy, or to a distributive share of the personal estate of an intestate, if the infant have no natural or testamentary guardian. By "natural guardian," in this statute, must be intended such a natural guardian as is entitled to the guardianship of the estate, as well as of the person of the infant. At common law, there was no such natural guardian; the guardian by nature, under that law, being only entitled to the custody of the person of his heir apparent. The previous law of Maryland, recognized only one natural guardian entitled to the guardianship of the estate of the infant; and that was the father. If, then, the infant have no father, nor testamentary guardian, the orphans' court has the right of appointing the guardian. The act of 1798, does not, in any manner, recognize the right of the infant to choose his guardian at any age. On the contrary, the orphans' court is authorized, in all cases in which it may appoint a guardian, to make the appointment until the full age of the infant. This power is directly repugnant to those parts of the former acts of Maryland, which authorize the infant to choose his guardian, and consequently repeals them. Guardianship in socage, and guardianship for nurture, which were the only two cases in which the infant had, by the common law, a right to choose his guardian, seem to have been virtually abolished by Act 1765, c. 39, which gave the power to the county courts to appoint guardians to all orphans entitled to a distributive share. The right of election, which they afterwards had, depended upon the statutes which were repealed by that of 1798 (chapter 101). The case of an orphan who has acquired property by deed of gift, or by purchase other than devise, is not provided for by that statute. There is no court competent to appoint a guardian for him, nor do we think he can constitute one by his own act. Indeed, we think he has not, in any case, a right to choose his guardian. And it was not without reason, that the legislature thought it proper to transfer the right of election from the infant to the orphans' court. At the age of fourteen, the infant begins to be restless and ungovernable, and the salu-

tary restraints of the guardian are irksome. The infant is apt to think his guardian penurious and tyrannical. He wants greater indulgences; and there are always artful and insinuating men enough, who are eager to grasp all the property they can lay hold of; and who, taking advantage of these dispositions in the infant, will stimulate his restlessness, excite his suspicions, undermine the authority of the guardian, and finally prevail on the infant, in his simplicity, to place his property in their hands. The chance of evil resulting from the infant's right of election, seems greater than the chance of good; and the choice of the court is more likely to be judicious than that of the infant.

The third error assigned, is that the infant was not brought into court to choose his guardian. This appears to us also to be a fatal error; especially as the infant was not out of the jurisdiction of the court at the time. In the case of Loyd v. Carew, in 1699, 1 Eq. Cas. Abr. 260, pl. 2, it is said, that "if a person, appointed a guardian pursuant to the statute (12 Car. II. c. 24), dies, or refuses to take upon himself the guardianship, my lord chancellor may appoint a guardian; but a guardian cannot otherwise be appointed, than by bringing the infant into court, or his praying a commission to have a guardian assigned him." 2 Fonbl. Bankr. Cas. bk. 2, pt. 2, c. 2, § 2, p. 236. In an anonymous case, in the upper bench, in 1655: "The court was moved in behalf of an infant to discharge a guardian assigned by the court, with an intent to make Richard Somers, attorney of this court, guardian in his room, and that the former inspection may be discharged, and that the infant may now be inspected again, because when the former inspection was, and the guardian assigned, there was no action depending in court against the infant. Glyn, C. J. Let it be so, for the cause you have alleged, and give notice of it to the former guardian." Style, 456. 1 Newl. Ch. Prac. 105. If the infant reside within twenty miles of London, the guardian is appointed by the court, for which purpose the infant, and the person intended to be appointed guardian, personally attend in court. If the infant reside above twenty miles from London, the guardian is appointed by commission, and the infant must be personally before the commissioners. 14 Ves. 172; 2 Newl. Ch. Prac. 151; 1 Har. Ch. Prac. 711, 712; 2 Mad. Ch. Prac. 279 The Maryland act of 1715 (chapter 39, § 7), which allowed an infant of the age of fourteen to choose his guardian, required the infant to be called to court, and then and there to choose his guardian; and Act 1798, cc. 101, 12, § 2, says, "The said court shall have power to call, or have brought before them, any orphan as aforesaid, for the purpose of appointing a guardian." If, as we have supposed, the only right which the infant had, in Maryland. to choose his guardian, be given by the statute, it must be exercised in the manner prescribed by the statute. We think, therefore, that if the infant had a right to choose his guardian, it could only be done personally, and in open court, and not having been so done, the election and appointment were void.

The fourth error assigned is, that the petitioners were not cited to show cause why they should not be removed. That the petitioners, who were the actual guardians, and who had a right to continue such until the full age of their ward, unless lawfully removed, should have had notice of his application, and an opportunity to show cause against it, seems to have been a course dictated by a common sense of justice. They had a power coupled with an interest, which they had a right, and perhaps, were bound to defend. But, as we think the orphan had no right to elect a guardian, and if he had, he could not exercise it out of court, we think the want of notice is a fatal error. The fifth error assigned is in substance only a repetition of the fourth.

Upon the whole, we are of opinion, that the orphans' court, having appointed Mr. Forrest and Mr. Mauro guardians of the infant until his age of twenty-one years, had no jurisdiction or authority to appoint Mr. Ritchie, and that his appointment is not merely voidable, but absolutely void; that Mr. Forrest and Mr. Mauro have never ceased to be guardians; and are now entitled to all the rights and powers of guardians; and that the sentence of the orphans' court, dismissing the bill of review, be reversed, with costs; and that this court, proceeding to pass such sentence, as the orphans' court ought to have passed upon the hearing of the bill of review, should order and decree that the order of the orphans' court, appointing John T. Ritchie guardian to the infant John W. Ott be reversed, with costs,

An appeal to the supreme court of the United States was dismissed for want of jurisdiction, the matter in dispute not being of the value of $1000. 2 Pet. [27 U. S.] 243.